IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

MINNESOTA LAWYERS MUTUAL            *
INSURANCE COMPANY
333 South Seventh Street            *
Minneapolis, Minnesota 55402
                                    *

              Plaintiff             *

v.                                  *

                                    *       Civil Action No.
RONISHA A. MOORE, ESQUIRE
2114 North Charles Street, Suite 300 *
Baltimore, Maryland 21218
                                    *
and
                                    *
BALTIMORE EAGLE, LLC
5839 Glen Arm Road                  *
Glen Arm, Maryland 21057
                                    *
Serve On:
                                    *
Resident Agent
Ian Parrish                         *
6016 Bellona Avenue
Baltimore, Maryland 21212           *

              Defendants            *

*      *      *      *      *      *      *      *      *      *      *      *      *

## **COMPLAINT**

Minnesota Lawyers Mutual Insurance Company ("MLM"), by its attorneys, Stephan Y.

Brennan, Patrice Meredith Clarke, and Iliff, Meredith, Wildberger & Brennan, P.C., files this

Complaint against Ronisha A. Moore ("Moore"), and Baltimore Eagle, LLC ("Baltimore

Eagle"), and states:

## PARTIES

1.      MLM is a corporation organized and existing under the laws of the State of Minnesota, which has its principal place of business in Minnesota.

2.      Moore is resident and citizen of the State of Maryland.

3.      Moore is an attorney admitted to practice law in Maryland, and Moore's law practice is located in Maryland.

4.      Baltimore Eagle is a limited liability company organized and existing under the laws of the State of Maryland, which has its principal place of business in Maryland.

5.      The amount in controversy in this case exceeds $75,000, exclusive of interest and costs.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. §1332(a).

7.      This action is brought pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§2201, *et seq*.

8.      Venue in this District is proper, pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events and omissions giving rise to this claim occurred in Maryland, and the insurance policies at issue in this action were issued in Maryland.

## FACTS

9.      Prior to the events that give rise to this lawsuit, Moore purchased a lawyers' liability insurance policy from MLM.    That policy had a one-year policy period.

10.      Each year following the purchase of her initial MLM policy, including the years relevant to this lawsuit, Moore continued to purchase lawyers' professional liability insurance

- 2 -

policies from MLM by submitting annual renewal applications.

11.     Each MLM policy issued to Moore had a one-year policy period, and the policy period for each MLM policy ran from September 6th of the year in which the policy was purchased and issued to September 6th of the following year, *e.g.*, 09/06/2017 - 09/06/2018, 09/06/2018 – 09/06/2019, 09/06/2019 – 09/06/2020, 09/06/2020-09/06/2021.

12.     Baltimore Eagle owns commercial property located at 2022 North Charles Street, Baltimore, Maryland ("Premises").

13.     In 2015, 4 Crazy Guys, LLC ("4CG") was formed.    4CG had several members, and ultimately also guarantors.    One of the guarantors of 4CG was John Yelcick ("John"). 4GC wanted to operate a "leather bar" located at the Premises.

14.     In March 2015, John loaned $300,000 to 4CG.    This loan was evidenced by a promissory note that was secured by a security agreement ("Security Agreement").    The Security Agreement was the subject of a UCC filing in the Maryland State Department of Assessments and Taxation ("SDAT").    Under the Security Agreement, John's loan was secured by the collateral of all 4CG's assets, which included "the Baltimore City liquor license utilized in Debtor's business."

15.     In November 2015, Baltimore Eagle entered into several contractual documents - - a Lease Agreement, a License Agreement (relating to intellectual property), and Guaranty of Agreement ("Contract Documents") - - with 4CG.    John signed these documents as a guarantor for 4CG.

16.     Baltimore Eagle claims the Contract Documents were intended to provide it with a first priority lien over 4CG's assets.

17.     In June 2016, Baltimore Eagle purchased the liquor license that was utilized in

4CG's business at the Premises.

16.     In July 2016, through a Lease Addendum ("Addendum"), the liquor license was transferred unto the name of 4CG for utilization in its business at the Premises.

17.     The Addendum states, *inter alia*, that the liquor license was subject to transfer back to Baltimore Eagle upon termination of the lease or if there was a breach of the Contract Documents, and 4CG and John executed documents related to the transfer of the liquor license back to Baltimore Eagle upon termination of the lease or default under the Contract Documents.

18.     After entering into the Security Agreement and other documents related to the loan from John and also after entering into the Contract Documents, 4CG issued a 20% interest to Indigo Dreams, LLC ("Indigo Dreams"), which was owned by John's brother, Mark Yelcick ("Mark").   In exchange for the 20% interest, Indigo Dreams invested $200,000 in 4CG.

19.     4CG subsequently defaulted on its loan from John, on its loan from Indigo Dreams, and under the Contract Documents with Baltimore Eagle.

20.     Baltimore Eagle was originally represented by Tom Donnelly in its landlord/tenant dispute with 4CG, and in July 2017 Moore was hired to take the representation over from Tom Donnelly.

21.     Moore sent a number of notices of default and requests to cure to 4CG on behalf of Baltimore Eagle in the latter half of 2017.

22.     In November 2017 and December 2017, John, through his attorney, sent a "Notification of Proposal to Accept Collateral in Full Satisfaction of Obligation Owed by 4 Crazy Guys, LLC to John Yelcick" ("Notice").   The Notice stated that the Security Agreement assigned 4CG's "Collateral" to John and that the Security Agreement defined "Collateral" as "all of the assets of [4CG's] business, tangible and intangible, including, but not limited to . . . the

Baltimore City Liquor License utilized in [4CG's] business . . ."

23.     The Notice was sent to Baltimore Eagle through its Resident Agent, Ian Parrish.

24.     In late November 2017, Indigo Dreams filed a lawsuit, *Indigo Dreams, LLC v. 4 Crazy Guys, LLC, et al.*, Circuit Court for Baltimore City, Case No. 24-C-17-005855 ("Receivership Action") that sought the appointment of a receiver for 4CG to oversee dissolution of the company and payment of debts.

25.     On January 5, 2018, Moore wrote to counsel for 4CG.   Moore took the position that the facts rendered 4CG insolvent, which was grounds for immediate termination of the Lease Agreement, but she gave 4CG a grace period to close on a contemplated loan that was intended to repay John in full, which would eliminate the insolvency and thus the lease would not be terminated.

26.     On January 10, 2018, Moore wrote to John's counsel about a plan that existed at that time under which the Parrish family that controlled Baltimore Eagle were working toward the goal of removing 4CG as tenant at the Premises.

27.     On January 15, 2018, John's counsel sent a copy of the above-described Notice directly to Moore.   As of this date, if not before, Moore had actual knowledge that 4CG took the position that the "Collateral"   - - as to which Moore knew on January 5, 2018 that John asserted the Security Agreement gave him a security interest that was "properly perfected and is a first priority lien" on which John had taken the steps under the Maryland Commercial Code "to take possession . . . immediately"   - - included "the Baltimore City Liquor License utilized in [4CG's] business."

28.     Moore knew John intended to file a lawsuit against, *inter alia*, 4CG before the lawsuit was filed.   On March 26, 2018, Moore wrote to John's counsel and advised that she

"would like to know if the lawsuit against 4CG was filed today."

29.     John's counsel responded to Moore and provided her with copies of the Complaint in the lawsuit, John's Motion for Partial Summary Judgment, John's Motion for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction, *etc*.   This lawsuit was styled *John Yelcick v. 4 Crazy Guys, LLC, et al.*, Circuit Court for Baltimore City, Case No. 24-C-18-001735 ("Primary Action")

30.     These documents that were filed in the Primary Action and provided to Moore included statements that the collateral included "the Baltimore City liquor license utilized in [4CG's] business."

31.     The Complaint in the Primary Action included three counts.   Count I was against 4CG only, and it sought a declaratory judgment as to John's right to the collateral.   Count II was asserted a tort claim for trover and conversion against 4CG and the three individual defendants (a member of 4CG and two people who were operating the leather bar at the Premises).   Count III was against all of the Defendants and it sought a TRO, Preliminary Injunction, and a Permanent Injunction.

32.     No later than March 26, 2018, Moore had actual knowledge that John had filed an action seeking, *inter alia*, a declaratory judgment that would establish his rights to collateral that included the liquor license.

33.     Also as of March 26, 2018, Moore had actual knowledge that Baltimore Eagle was not included as a party in a lawsuit in which John sought a declaratory judgment that would establish his rights to a liquor license in which Baltimore Eagle had an interest.

34.     Also, no later than March 26, 2018, Moore had actual knowledge that John had filed a Motion for Partial Summary Judgment as to Count I of the Complaint.

35.    The Receivership Action was consolidated with the Primary Action for all purposes, with all filings after that point to use the case number of the Primary Action.

36.    Moore had actual knowledge that a hearing was scheduled on John's Motion for Partial Summary Judgment and that the hearing was postponed (one or more of the individual defendants went into bankruptcy) and rescheduled to September 11, 2018.

37.    In a "Motion to Vacate or in the Alternative Amend the Judgment Entered on September 11, 2018 on the Ground of Fraud" that Moore filed more than three months later on December 17, 2018, Moore indicated her awareness throughout the Primary Action that Baltimore Eagle had an interest in the collateral of 4CG.

38.    Moore also indicated in the motion she filed on December 17, 2018 that she discovered sometime prior to August 7, 2018 that the Addendum, *supra*, that called for the transfer back to Baltimore Eagle of the liquor license upon termination of the lease or breach of the Contract Documents, had not been provided by John to his Counsel.    As a result, Moore sent a copy of the Addendum to John's counsel on August 7, 2018 by e-mail.

39.    Moore did not, however, attend the hearing on John's Motion for Partial Summary Judgment on September 11, 2018.

40.    After the hearing on September 11, 2018, John's counsel wrote to Moore, advised that John's Motion for Partial Summary Judgment was granted as was a motion to appoint a receiver after a hearing at which 4CG did not appear and was not represented by counsel, and transmitted the declaratory judgment issued in favor of John.

41.    Moore had actual knowledge on September 11, 2018 that the Declaratory Judgment Order stated, *inter alia*, that John had all rights in the "Collateral" that included "the Baltimore City Liquor License utilized in [4CG's] business" and that "John [] has all rights in the

- 7 -

Baltimore City Liquor License utilized in [4CG's] business, including but not limited to the certain alcoholic beverages license #LBD7273, issued to [4CG] for use at [the Premises]."

42.     During the summer of 2018, Moore filed a petition with the Board of Liquor License Commissioners for Baltimore City ("Liquor Board") to transfer the liquor license back to Baltimore Eagle.

43.     On September 19, 2018, counsel for John sent a letter to Liquor Board.    Counsel for John advised the Liquor Board "[t]his office represents John [], an interested part to the petition. . ."    Counsel for John attached the Declaratory Judgment Order issued on September 11, 2018, through which John "was found by the Circuit Court to have all rights in the collateral used to operate [4CG's] business, including the Baltimore City Liquor License."    Through counsel, John opposed Baltimore Eagle's petition

to transfer the liquor license, "[a]s [John] has all rights in the liquor license that is the subject of the petition to transfer the petition to transfer ownership should not be granted."

44.     On October 5, 2018, Ian Parrish, the Resident Agent of Baltimore Eagle, wrote to Moore "with a few points to assist you with your complaint/motion," a draft of which he hoped to see on Monday, October 8, 2018 so the principals in Baltimore Eagle and another attorney, Thurman Zollicoffer, Esquire, "have time to review for our Thursday meeting with John. . ." The "few points" consisted of Baltimore Eagle's position that various of its documents "give us first right to our liquor license."

45.     Moore did not provide the draft by October 8, 2018.

46.     At 8:34 p.m. on October 8, 2018, Ian Parrish wrote to Moore saying "[w]e expected to see that draft today."    Mr. Parrish also wrote "[w]e're concerned we're going to lose our business," and "[w]e're disturbed that you could have prevented this situation."

47.     The Liquor Board hearing was scheduled for November 29, 2018.   Two days before the hearing, John, through successor counsel, sent a second letter to the Liquor Board that was sent to Moore by facsimile.   This letter identified John as "the owner of the alcoholic beverage license that is the subject of the above noted hearing schedule[d] before the Board on November 29, 2018. . ."   The letter stated John "opposes the purported transfer."   The letter also stated that the Board already had "in its file a copy of the September 11, 2018 order of the Circuit Court for Baltimore City . . . ordering in part 'John [] has all rights in Baltimore City Liquor License #LBD7273, issued to [4CG] for use at 2022 N. Charles Street.'   That is the license purported to be transferred by others."

48.     The liquor license hearing did not result in the transfer of the Liquor License to Baltimore Eagle, as the Liquor Board determined it could not transfer the liquor license in contravention of the Declaratory Judgment Order.

49.     As noted, *supra*, John's Motion for Partial Summary Judgment was only as to Count I of the Complaint in the Primary Action, and it also was only as to 4CG and not the individual defendants.   The Declaratory Judgment Order, therefore, was not a final judgment in the Primary Action.   Trial in the Primary Action was scheduled for January 8, 2019.

50.     Although Moore had actual knowledge of the Declaratory Judgment Order on September 11, 2018, she did not file a timely motion to intervene in the Primary Action within a reasonable time after entry of that Order, when approximately four months remained before the trial date.

51.     Moore waited more than three months after entry of the Declaratory Judgment Order to file a Motion to Vacate or in the Alternative Amend the Judgment Entered on

- 9 -

September 11, 2018 on the Ground of Fraud ("Motion to Vacate") on December 17, 2018, which was approximately three weeks before the scheduled trial date.

52.     There were problems with Moore's Motion to Vacate.    One problem with Moore's Motion to Vacate was that her client, Baltimore Eagle, was not a party in the Primary Action.    The Maryland Rules required Moore to file a motion to intervene, before filing the Motion to Vacate.    *See*, Maryland Rule 2-214.

53.     As Baltimore Eagle claimed in an interest relating to property that was a subject of the Primary Action, and Baltimore Eagle was so situated that the disposition of the Primary Action may as a practical matter have impaired or impeded its ability protect that interest as its interest was not adequately represented by existing parties, the motion for intervention should have been under Maryland Rule 2-214(a) as a matter "of right."

54.     The "[p]rocedure" for a person desiring to intervene is that the person shall file and serve a motion to intervene that states the grounds for intervention and "shall be accompanied by a copy of the proposed pleading, motion or response setting for the claim or defense for which intervention is sought."    *See*, Maryland Rule 2-214(c).    If the motion for intervention is granted, an order is entered designating the intervenor as a plaintiff or a defendant.    *Id.*    "Thereupon, the intervenor shall promptly file the pleading, motion, or response and serve it upon all parties."    *Id.*

55.     The Motion to Vacate was a nullity because Baltimore Eagle had no right to file it until after it filed a motion to intervene that was granted.

56.     Another problem with Moore's Motion to Vacate is that she cited the wrong rule and thus asserted an incorrect basis for the Court's ability to vacate or revise the Declaratory Judgment Order.    Moore's Motion to Vacate was filed pursuant to Maryland Rule 2-535(b), and

it asserted the ground of "fraud."

52.     Maryland Rule 2-535(b), however, only applies to final judgments, *i.e.*, judgments that dispose of all claims between all parties and thus leave nothing more for the court to do to end the case.   *See*, Maryland Rule 2-602(a).   Any other order or other form of decision, however, designated, is not a final judgment.   *Id.*

53.     Orders or decisions that are not final judgments are subject to revision under Maryland Rule 2-602(a), not Maryland Rule 2-535(b), and they remain "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties," *i.e.*, subject to revision at any time before entry of a final judgment.

54.     As the plain language of Maryland Rule 2-602(a) establishes, and as case law from Maryland's appellate courts applying this Rule establishes, there is no 30-day deadline for filing a motion to revise an interlocutory ruling.

55.     As Maryland appellate case law establishes, moreover, revision of judgments under Maryland Rule 2-602(a), like revision of final judgments within 30 days under Maryland Rule 2-535(a), is subject the court's broad, plenary powers to revise judgments in the interest of justice, which is a much more favorable standard for movants than is provided under Maryland Rule 2-535(b).

56.     Only after an opposition to the Motion to Vacate was filed on January 2, 2019 did Moore belatedly file a Motion to Intervene on January 3, 2019, nearly four months after entry of the Declaratory Judgment Order and five days before the trial date.

57.     It is only "[u]pon timely motion" that a party shall be permitted to intervene, even as "[o]f right" rather than a "[p]ermissive" intervention.   *See*, Maryland Rules 2-214(a) and (b).

-

58.    The trial judge denied the Motion to Intervene at the trial on January 8, 2019 and thus also properly held that the Motion to Vacate was moot.

59.    Judgment was entered in the Primary Action on January 10, 2019.

60.    Subsequently, Baltimore Eagle filed motions for reconsideration of the trial court's adverse rulings through Moore and additional counsel.   A motion to reconsider the rulings on the Motion to Intervene and Motion to Vacate was filed on January 18, 2019.

61.    John filed a Petition for Constructive Civil Contempt against Baltimore Eagle on January 28, 2019.

62.    The trial court denied the motion for reconsideration on April 4, 2019, on which date it also "granted" John's petition for contempt insofar as the Court issued a "show cause order" that required Baltimore Eagle to answer within 10 days of service of the order and to appear in court on April 18, 2019 to show cause why an order for constructive civil contempt should not be entered against it.

63.    Baltimore Eagle filed a Notice of Appeal on May 3, 2019.   The "show cause" hearing was postponed, and on or about the date of the hearing the parties filed a Settlement Agreement, Confession of Judgment, and Mutual Release between John, Baltimore Eagle, Ian Parrish, and Indigo Dreams.   As a result, the parties stipulated to the dismissal with prejudice of the contempt proceedings and dismissed the appeal.

64.    Although Moore knew on September 11, 2018 of the declaratory judgment in the Primary Action that was adverse and prejudicial to her client's, Baltimore Eagle's, interests in the liquor license, she did not timely report this fact to MLM.

65.    Although Moore knew in the late summer of 2018 and continuing into the fall of

2018 that John opposed Baltimore Eagle's efforts with the Liquor Board to transfer the liquor license to it because of the September 11, 2018 declaratory judgment, Moore did not timely report this fact to MLM.

66.     Although Moore knew on October 8, 2018 that her client wrote to her that it was "disturbed that you could have prevented this situation," she did not timely report this fact to MLM.

67.     Although Moore knew in 2018 that it was necessary to file a motion, or motions, in the Primary Action in order to avoid damages to her client, Baltimore Eagle, if it could not obtain the liquor license because of the September 11, 2018 declaratory judgment in the Primary Action, she did not timely report these facts to MLM.

68.     Although Moore knew very early in January 2019 that her motions filed without MLM's knowledge or participation in the Primary Action were denied, she did not timely notify MLM of these facts.

69.     Moore did not timely notify MLM either that a motion for reconsideration of the adverse rulings entered in the Primary Action in early January 2019 was contemplated, or that the motion for reconsideration was filed, or denied.

70.     Moore did not timely notify MLM that an appeal was contemplated in the Primary Action, and she did not timely notify MLM either that an appeal was filed or that the appeal was voluntarily dismissed.

71.     Moore did not report the September 11, 2018 declaratory judgment to MLM within 60 days of the expiration of the policy period of the policy that ran from 09/01/2017 – 09/06/2018.   Moore also did not report this fact to MLM at any time during the policy period of the policies that ran from 09/06/2018 – 09/06/2019 or 09/06/2019 – 09/06/2020.

- 13 -

72.     Moore did not report any of the facts that are described, *supra*, that relate to her representation of Baltimore Eagle in connection with the liquor license, including the facts relating to her representation of Baltimore Eagle in connection with the Primary Action and before the Liquor Board, at any time during the policy period of the policies that ran from 09/06/2018 – 09/06/2019 or 09/06/2019 – 09/06/2020.

73.     Moore affirmatively represented and made warranties to MLM that she had no knowledge of facts that could lead to claims in her renewal applications for the policies that ran from 2018-2019, 2019-2020, and 2020-2021, respectively.

74.     The "Coverage" section of Moore's policy with MLM provides:

WE will pay, subject to OUR limit of liability, all DAMAGES the INSURED may be legally obligated to pay and CLAIM EXPENSE(S), due to any CLAIM, provided that:

(1) the CLAIM arises out of any act, error or omission of the INSURED or a person for whose acts the INSURED is legally responsible;
(2) the act, error, or omission occurred on or after the PRIOR ACTS RETROACTIVE DATE and prior to the expiration date of the POLICY PERIOD;
(3) the CLAIM results from the rendering of or failure to render PROFESSIONAL SERVICES;
(4) the CLAIM is deemed made during the POLICY PERIOD; and
(5) the CLAIM is reported to US during the POLICY PERIOD or within 60 days after the end of the POLICY PERIOD.

A CLAIM is deemed made when:
(1) a demand is communicated to an INSURED for DAMAGES resulting from the rendering of or failure to render PROFESSIONAL SERVICES; or
(2) an INSURED first becomes aware of any actual or alleged act, error, or omission by any INSURED which could reasonably support or lead to a CLAIM.

All CLAIMS arising out of the same or related PROFESSIONAL SERVICES shall be considered one CLAIM, and shall be deemed made when the first CLAIM was deemed made.

75.     The "Defense and Settlement" section of Moore's MLM policy states "WE have the exclusive right to investigate, negotiate, and defend CLAIMS. . ." The "Defense and Settlement" section of Moore's MLM Policy also provides "[t]he INSURED must cooperate with US in the investigation and defense. . ."

76.     The definition of "Application" in Moore's MLM policy states "APPLICATION means:   all information provided to US to establish coverage."

77.     The definition of "Claims" in Moore's MLM policy states:

"CLAIMS" means:
(1) a demand communicated to the insured for DAMAGES or PROFESSIONAL SERVICES;
(2) a lawsuit served upon the INSURED seeking such DAMAGES;
(3) any notice or threat, whether written or oral, that any person, business entity or organization intends to hold an INSURED liable for such DAMAGES; or
(4) any act, error or omission by any INSURED which could reasonably support or lead to a demand for DAMAGES.

78.     In Moore's MLM policy, "'DAMAGES' means[] monetary judgments or monetary settlements," subject to the enumerated exceptions, and "PROFESSIONAL SERVICES" includes "legal or notary services provided for others, while engaged in the private practice of law. . ."

79.     Moore's MLM Policy also includes a "NOTICE OF CLAIMS AND DISCIPLINARY PROCEEDINGS" section, which is separate and distinct from the reporting requirement that triggers coverage under the "Coverage" section of the policy, *supra*.    Under this section, "[i]n the event of a CLAIM, DISCIPLINARY PROCEEDING, disciplinary investigation or notice to appear before a review board, the INSURED must: (1) give immediate written notice to US; and (2) forward every demand, notice, summons, or other communication received by the INSURED or his or her representative to" MLM.   This section also states that

even if an insured complies with its obligations under the "NOTICE OF CLAIMS AND DISCIPLINARY PROCEEDINGS" section, such compliance does not expand coverage as "[y]ou must give US notice during the POLICY PERIOD or within 60 days of the end of the POLICY PERIOD for coverage to apply."

80.     Moore's MLM Policy also contains a "Representation in Application" section, which states:

> The APPLICATION is part of this policy.
>
> By acceptance of this policy the INSURED agrees:
>
> (1) the statements in the APPLICATION are the representations of all INSUREDS;
> (2) such representations are material as this policy is issued in reliance upon the truth of such representations; and
> (3) this policy embodies all of the agreements between the INSURED, US and/or OUR agent.

81.     On February 19, 2021, counsel for Baltimore Eagle wrote to Moore with a copy of a Complaint that had not been filed, "as it is the policy of this law firm to discuss potential claims with all parties before filing suit.   Therefore, it is requested that you refer this matter to your insurance carrier or attorney in an effort to resolve this matter in an amicable fashion."

82.     The thrust of Baltimore Eagle's claim was that Moore's "failure to intervene" and related "failure to represent [Baltimore Eagle's] interests" in the Primary Action "led to the loss" of the liquor license and of Baltimore Eagle's "ability to recover damages from [4CG] and its principals' breach of contract," *i.e.*, "[b]ut for Ms. Moore's failure to time file a Motion to Intervene or action to preserve [Baltimore Eagle's] rights,

- 16 -

[Baltimore Eagle} would have retained the rights to the 4CG collateral, including, but not limited to, the Liquor License."

83.     Moore did not timely notify MLM of the February 19, 2021 letter from Baltimore Eagle's counsel, as Baltimore Eagle's counsel requested, which deprived MLM of the opportunity to (1) engage in pre-suit investigation of the claim, and (2) engage in the pre-suit discussions that Baltimore Eagle had requested in the exercise of MLM's right to negotiate and defend the claim.

84.     Moore violated the "NOTICE OF CLAIMS AND DISCIPLINARY PROCEEDINGS" section of the MLM policy as she did not immediately forward the letter from Baltimore Eagle's counsel and the unfiled Complaint to MLM.

85.     Because Moore violated the "NOTICE OF CLAIMS AND DISCIPLINARY PROCEEDINGS" section of the MLM Policy as she did not immediately forward the February 19, 2021 letter from Baltimore Eagle's counsel and the unfiled Complaint to LMM, and because she did not comply with the February 19, 2021 request by Baltimore Eagle's counsel that she advise MLM of his letter and the unfiled Complaint so that discussions could occur that might have avoided the filing of a lawsuit, on May 10, 2021 Baltimore Eagle filed a lawsuit against Moore, *Baltimore Eagle, LLC v. Ronisha A. Moore*, Circuit Court for Baltimore City, Case No. 24-C-21-002154 ("Legal Malpractice Action").

86.     After a delay of years since she had knowledge of the facts upon which the claim is based, Moore eventually reported Baltimore Eagle's claim to MLM on June 30, 2021.

- 17 -

87.     Even after her initial, belated, report of Baltimore Eagle's claim, Moore has repeatedly and persistently continued to violate her duty to cooperate with MLM in connection with the claim, and she has also repeatedly and persistently continued to violate the "NOTICE OF CLAIMS AND DISCIPLINARY PROCEEDINGS" section of the MLM Policy.

88.     After her initial, belated, report of Baltimore Eagle's claim, Alice M. Sherren, Esquire, ("Ms. Sherren"), a Senior Claim Attorney at MLM, requested, both orally and in writing, that Moore provide a copy of her file for the legal representation that gives rise to this claim so MLM could exercise its contractual rights to investigate, and potentially negotiate and defend the claim.

89.     After Moore ignored Ms. Sherren's requests, MLM engaged counsel to represent it in connection with the review and investigation of the claim for the purpose of determining insurance coverage.

90.     Through counsel, MLM wrote to Moore several times over a period of several months, reiterating the request that Moore provide a copy of her file and explaining why it was necessary for MLM to have the file in order for MLM to exercise its contractual rights under the policy.

91.     Through counsel, MLM also repeatedly reminded Moore that her failure to cooperate with MLM's investigation of the claim prejudiced MLM because it could not investigate, or potential negotiate, or defend the claim without her file, and repeatedly advised Moore that insureds' failures to cooperate that result in prejudice to insurers because insurers' contractual rights are impeded are a basis for denial of coverage.

92.     Through counsel, MLM further repeatedly reminded Moore of the "NOTICE OF CLAIMS AND DISCIPLINARY PROCEEDINGS" section of her insurance policy with MLM that required her to, *inter alia*, "forward every demand, notice, summons or other communication received by the INSURED or his or her representative to" MLM, and repeatedly requested that Moore immediately forward all papers with which she was served in the Legal Malpractice Action to Ms. Sherren.

93.     Notwithstanding these requests, Moore did not provide her file until February 1, 2022 when, without prior communication, she delivered it to MLM's coverage counsel.

94.     Notwithstanding these requests, Moore has not forwarded any papers with which she was served in the Legal Malpractice Action to Ms. Sherren.

95.     MLM was prejudiced by Moore's multiple violation of the terms of the policy, including but not limited to the terms of the "Coverage" section and the "Notice of Claims and Disciplinary Proceedings" sections of the policy, which also constitutes a failure to cooperate under the "Defense and Settlement" section of the policy.

96.     Moore's failure to timely notify MLM of this claim resulted in MLM being excluded from the process of determining the timing and type of motions that should have been filed in the Primary Action within a reasonable period of time, and as promptly as practicable, after the Declaratory Judgment Order was entered.

97.     MLM was excluded from participating in the preparation and filing of a timely motion to intervene and an accompanying motion to vacate that cited the correct Maryland Rule and the correct revisory standard, *etc.*

98.     A motion to intervene that was filed within a reasonable time after entry of the Declaratory Judgment Order on September 11, 2018, and thus months before the trial date, should have been granted.

99.     MLM was also excluded from the process when motions for reconsideration were considered and filed in early 2019 and when the appeal was filed, and MLM was excluded from the process when the decision was made that Baltimore Eagle would dismiss its appeal and settle with John, thereby leading to most of the purported damages that are sought in the Legal Malpractice Action.

100.     MLM was prejudiced by Moore again in February 2021, when she failed to provide MLM with a copy of the letter from Baltimore Eagle's counsel that transmitted the copy of the then-unfiled Complaint, which was not only required by the policy but also was requested by Baltimore Eagle's counsel, so that MLM could exercise its contractual rights to investigate and negotiate the claim at a time when, as Baltimore Eagle's counsel offered, such an investigation and negotiation may have avoided the filing of the Legal Malpractice Action.

101.     Subsequently, MLM was prejudiced by Moore's failure to cooperate with multiple requests that she produce her file so that MLM could exercise its contractual rights.

102.      In addition, MLM has been prejudiced by Moore's failure to comply with repeated requests that she immediately forward copies of all documents that were served on her to Ms. Sherren.

103.     MLM has advised Moore of its position that there is no coverage for Baltimore Eagle's claim and has advised Moore of its intention to file an action seeking a declaratory judgment that there is no coverage for this claim.

20

104.    MLM also advised Moore that notwithstanding the lack of coverage MLM was willing to provide a defense in the Legal Malpractice Action, through an attorney who is independent from and not associated with the firm engaged by MLM with regard to coverage issues, subject to MLM's full reservation of rights and without waiver of any of MLM's rights or remedies while MLM's action seeking a declaratory judgment is pending.

105.    MLM advised Moore that if she wished to accept MLM's offer to provide her with a defense in the Legal Malpractice Action while its action seeking a declaratory judgment is pending, subject to MLM's full reservation of rights under its policies and with the understanding that MLM expressly does not waive any of its rights or remedies under its policies, she should immediately notify Ms. Sherren of her decision and she should also immediately forward to Ms. Sherren all documents that have been served or filed in the Legal Malpractice Action.

106.    Moore has not accepted MLM's above-described offer to provide her with a defense in the Legal Malpractice Action, and Moore has not forwarded to Ms. Sherren any documents that have been served or filed in the Legal Malpractice Action.   The docket in the Legal Malpractice Action reflects that Moore has filed several documents in the Legal Malpractice Action as a self-represented litigant and that Baltimore Eagle has also filed several documents in the Legal Malpractice Action.

## COUNT I - FOR A DECLARATORY JUDGMENT THAT THERE IS NO COVERAGE UNDER THE MLM POLICIES

107.    MLM adopts by reference, as if fully set forth herein, the averments of paragraphs 1-106.

21

108.    With regard to potential claims, and also with regard to determining whether a "representation in application" provision or a "prior knowledge" exclusion applies to exclude coverage, Maryland law establishes an objective standard of reasonableness in determining an insured's prior knowledge in professional liability insurance cases.

109.    Definition 4 of "CLAIMS" in the MLM policy, *supra*, "means . . . any act, error or omission by any INSURED which could reasonably support or lead to a demand for DAMAGES."   This occurred with regard to Baltimore Eagle's claim against Moore no later than during the policy period for the MLM policy that ran from 09/06/2018 – 09/06/2019, *supra*.

110.    Under the MLM policy, *supra*, "[a] CLAIM is deemed made when . . .   an INSURED first becomes aware of any actual or alleged act, error, or omission by any INSURED which could reasonably support or lead to a CLAIM," and "[a]ll CLAIMS arising out of the same or related PROFESSIONAL SERVICES shall be considered one CLAIM, and shall be deemed made when the first CLAIM was deemed made."   Baltimore Eagle's claim against Moore, therefore, is deemed made no later than during the policy period for the MLM policy that ran from 09/06/2018 – 09/06/2019, *supra*.

111.    The claim was not reported to MLM during the policy period of the policy that ran from 09/06/2018 – 09/06/2019 nor within 60 days after expiration of the policy period of that policy, which was the necessary second element of the two-part trigger of coverage under this policy, *supra*.

112.    The claim also was not reported to MLM during the policy period of the policy that ran from 09/06/2019 – 09/06/2020 nor within 60 days after expiration of the policy period of that policy, which would have been the necessary second element of the two-part trigger of

coverage under that policy if the claim had been deemed made under that policy, *supra.*

113.     There is no coverage for the claim under the MLM policy that was in

place for the policy period that ran from 09/06/2019 – 09/06/2020, or under subsequent policies,

because Moore violated the "Representation in Application" provisions of those policies by

affirmatively representing and providing warranties to MLM in her renewal applications that she

was not aware of any facts that could give rise to a claim.

114.     There also is no coverage for the claim under the MLM policy that was in place

for the policy period that ran from 09/06/2019 – 09/06/2020, or under subsequent policies,

because the claim was deemed made during the policy period of the policy that ran from

09/06/2018 – 09/06/2019, which precludes coverage under subsequent policies, *supra.*

115.     Likewise, there is no coverage for the claim under the MLM policies that were in

place prior to the policy period that ran from 09/06/2018 – 09/06/2019 as the claim was not

deemed made prior to the expiration of those policies and prior to the issuance of the 2018-2019

policy.

116.     Moore has also repeatedly violated the separate and distinct "NOTICE OF

CLAIMS AND DISCIPLINARY PROCEEDINGS" provision of the MLM polices, and MLM

was prejudiced by Moore's violation of this provision of the policies, *supra* and *infra.*

117.     The "Defense and Settlement" section of the MLM policies affords MLM, *inter

alia*, the exclusive right to investigate or defend "CLAIMS," and as the plain language of the

Policy establishes this includes "CLAIMS" that exist before (1) any notice or threat that a person

intends to hold an insured liable for "DAMAGES," or (2) any demand for "DAMAGES" is

communicated to an insured, *supra*.    The purpose of such provisions in the MLM policies is to

enable MLM to participate in situations such as existed, no later than September 11, 2018, in the Primary Action, so that actual "CLAIMS" for "DAMAGES" can be avoided when it is possible to do so, or so that damages caused by insureds' acts or omissions may be mitigated if not entirely avoided.

118.    The "Defense and Settlement" section of the MLM policies also affords MLM the exclusive right to negotiate "CLAIMS."    Baltimore Eagle's counsel requested that Moore notify MLM of his letter and the accompanying unfiled Complaint in February 2021 for the express purpose of engaging in discussions about an amicable resolution that could have resulted in the avoidance of the filing of the Legal Malpractice Action.

119.    MLM was prejudiced by Moore again in February 2021, when she failed to provide MLM with a copy of the letter from Baltimore Eagle's counsel that transmitted the copy of the then-unfiled Complaint, which was not only required by the policy but also was requested by Baltimore Eagle's counsel, so that MLM could exercise its contractual rights to investigate and negotiate the claim at a time when, as Baltimore Eagle's counsel offered, such an investigation and negotiation may have avoided the filing of the Legal Malpractice Action.

120.    The "Defense and Settlement" section of the MLM policies also provides "[t]he INSURED must cooperate with US in the investigation and defense. . ."    Moore repeatedly violated this provision of the MLM policies, and MLM was prejudiced by Moore's violation of this provision of its policies.

121.    There is no coverage, therefore, for Baltimore Eagle's claim against Moore under the MLM policies.

122.    An actual and justiciable controversy exists between MLM, Moore, and Baltimore

Eagle as to whether there is coverage for Baltimore Eagle's claim against Moore under the MLM policies.

WHEREFORE, MLM seeks a declaratory judgment that declares:

A.      There is no coverage for Baltimore Eagle's claim against Moore under the MLM policies.

Respectfully submitted,

/s/ Stephan Y. Brennan
Stephan Y. Brennan
Federal Bar No. 23597
Iliff, Meredith, Wildberger & Brennan, P.C.
Patriots Plaza, Suite 201-203
8055 Ritchie Highway
Pasadena, Maryland 21122
(410) 685-1166
fax (410) 685-1233
e-mail: steve@ilimer.com

/s/ Patrice Meredith Clarke
Patrice Meredith Clarke
Federal Bar No. 18824
Iliff, Meredith, Wildberger & Brennan, P.C.
Patriots Plaza, Suite 201-203
8055 Ritchie Highway
Pasadena, Maryland 21122
(410) 685-1166
fax (410) 685-1233
e-mail: patrice@ilimer.com

Attorneys for Minnesota Lawyers Mutual Insurance Company, Plaintiff